# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREGORY GRANT** : | |
| 318 Moon Clinton Road : | |
| Moon Township, PA 15108, : | Civil Action No. 2:20-1856 |
| : | |
| **Plaintiff** : | |
| : | **Jury Trial Demanded** |
| v. : | |
| : | |
| **GREAT ARROW BUILDERS, LLC** : | |
| 300 Frankfort Road : | |
| Monaca, PA 15061 : | |
| : | |
| **Defendant.** : | |

## COMPLAINT

Plaintiff, Gregory Grant, by and through his attorneys, Goldstein Law Partners, LLC, hereby files this complaint against the Great Arrow Builders, LLC, and in support thereof, avers as follows:

**I.    PRELIMINARY STATEMENT**

1. In this action, Plaintiff, Gregory Grant seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and costs and attorneys' fees against her prior employer, the Great Arrow Builders, LLC. ("Great Arrow"), for violations of federal and state laws relating to unlawful racial discrimination and retaliation.

**II.    JURISDICTION**

2. This action arises under Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C. §2000e, *et seq.*; the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951, *et seq.*; and tort law.

3.  Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. §1343(4) and 29 U.S.C. §216(b), and over the state law claims pursuant to the doctrine of pendant jurisdiction.

4.  Jurisdiction over the federal claims is appropriate because Mr. Grant timely filed a complaint with the Equal Employment Opportunity Commission ("EEOC") regarding the unlawful discrimination and retaliation that he was subjected to by Great Arrow.

5.  More than one-hundred and eighty (180) days have elapsed since those charges were filed. On September 1, 2020, the EEOC mailed to Mr. Grant a Ninety-Day Right to Sue Letter.  A true and correct copy of the Right to Sue Letter is attached hereto as "Exhibit 1".

6.  Jurisdiction over the state claims is appropriate because Mr. Grant's complaint with the EEOC was cross-filed with the Pennsylvania Human Relations Commission ("PHRC").

7.  Declaratory, injunctive and equitable relief are sought pursuant to Title VII, as amended by the Civil Rights Act of 1991, 28 U.S.C. §2001 and §2002, and the PHRA, 43 P.S. §962.

8.  Compensatory and punitive damages are sought pursuant to Title VII, as amended by the Civil Rights Act of 1991, the PHRA, and under the pendent state claims; and other damages are sought, including but not limited to back pay and front pay and other lost benefits under Title VII, as amended by the Civil Rights Act of 1991, the PHRA, and tort law.

9.  Costs and attorneys' fees are sought pursuant to Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C. §2000e-5(k); Rule 54 of the Federal Rules of Civil Procedure, and the PHRA, 43 P.S. §962 (c.2).

**III.    VENUE**

10. This action properly lies in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(b) because the claim arose in this judicial district.

**IV.    PARTIES**

11. Plaintiff, Gregory Grant, is an adult African American male who presently resides at 318 Moon Clinton Road, Moon Township, Pennsylvania 15108.

12. Defendant, Great Arrow Builders, LLC, is an employer that engages in an industry affecting interstate commerce and employs more than fifteen (15) regular employees. Mr. Grant was employed by Great Arrow and worked primarily in or near its business location at 300 Frankfort Road, Monaca, Pennsylvania 15061.

**V.    FACTS**

13. Mr. Grant is a member of a welder's union, who relocated for employment reasons from Las Vegas, Nevada to the Pittsburgh area in Pennsylvania.

14. On or about the Spring or late Winter of 2020, Mr. Grant commenced employment with Great Arrow as a certified welder. Throughout the term of his employment, Mr. Grant was the only African American who was qualified as a certified welder on a team of all white colleagues and direct supervisors.

15. Welders are trained and skilled artisans who specialize in joining pieces or sheets of metal together. These craftsmen work with different types of metals, including stainless steel, aluminum, brass, and steel.

16. Great Arrow hired Mr. Grant as a welder, but assigned him to lesser positions that were unrelated to the trade of welding.

17. When he was hired by Great Arrow, Mr. Grant was a certified welder in Nevada and possessed significant years of experience in a trade through prior job experiences and apprenticeships.

18. In order to become a certified welder in Pennsylvania, Mr. Grant was required to (i) sit for a Certified Welder Exam and (ii) pay a $35 fee to register for the exam. Pennsylvania also requires welders to sit for the test in an examination center certified by the American Welding Society ("AWS").

19. Immediately when he arrived, Mr. Grant intended to register and to sit for the Pennsylvania examination and receive his welders' certification in this Commonwealth.

20. Taking this examination and becoming certified is the normal first step, and employers help to facilitate this process when a welder is hired from out-of-state.

21. Refusing to assist Mr. Grant with the certification process, Great Arrow instead it assigned Mr. Grant to a crew as an unskilled steel erector – not as a welder, the position for which he had been hired.

22. Mr. Grant suffered severe and pervasive harassment from Great Arrow's steel erecting crew.

23. The foreman and other members of Great Arrow's steel erecting crew routinely ordered Mr. Grant to complete menial and degrading tasks, not tasks appropriate for a skilled worker (and specifically a skilled welder).

24. None of the other white welders employed by Great Arrow – or even white members of steel erecting crew – received the degrading treatment that Mr. Grant experienced daily during his employment.

25. Mr. Grant reported his mistreatment and harassment to Great Arrow's Labor Relations Strategy Management; specifically, Mr. Grant complained about the company's interference with his ability to take Pennsylvania's test for welder certification and, by extension, the lesser position to which Great Arrow had relegated him upon his arrival.

26. Subsequently, Great Arrow assisted Mr. Grant in registering and sitting for the Pennsylvania certification exam. Mr. Grant easily passed the examination, demonstrating his qualifications and skill as a welder.

27. Great Arrow, nevertheless, did not alter its ill treatment of Mr. Grant.

28. Despite successfully passing Pennsylvania's examination and becoming a certified welder – the position for which Great Arrow hired him – the employer never gave Mr. Grant a welding box or other standard equipment provided to welders.

29. Great Arrow reassigned Mr. Grant to a second crew. Although this crew was not primarily a welding crew, Mr. Grant was afforded some opportunity to work within his chosen trade. Such work was scarce and ultimately proved short-lived, however.

30. On many occasions, Great Arrow called in its welders for overtime work on Sundays, paying the welders double the standard rate of pay. Great Arrow routinely called in its white welders, but never called in Mr. Grant for overtime work on Sundays.

31. While assigned to his second crew, Mr. Grant's work was inspected and praised with high marks for its skill.

32. Unfortunately, while working with the second crew, another white crewmember began harassing Mr. Grant. This crewmember's name was "Mike."

33. Mike overtly ignored Mr. Grant, which detrimentally affected the ultimate work product produced. Eventually, Mike publicly shouted and cursed at Mr. Grant in a loud voice, using profane and defamatory language.

34. Mr. Grant reported this incident to Great Arrow's Labor Relations Strategy Management, citing it as another example of the continued harassment he was suffering.

35. Great Arrow proceeded to, once again, reassign Mr. Grant to a third crew.

36. Finally, after nearly five months of harassment and degrading assignments, the third crew to which Great Arrow assigned Mr. Grant was – in fact – a welding crew. Of course, Great Arrow transferred Mr. Grant after only two weeks, citing wholly pre-textual and trumped up reasons for the abrupt transfer.

37. Immediately after being reassigned to the third crew, Mr. Grant's welding credentials were taken without explanation. Mr. Grant was told that he needed to retake the Pennsylvania examination if he wished to continue as a welder for Great Arrow.

38. Mr. Grant was given the Pennsylvania test for a second time despite easily passing originally. He was prevented from finishing the re-examination and, as a result, failed.

39. Following this incident, Mr. Grant was told that the quality of his workmanship was "terrible." Prior evaluations from Great Arrow entirely belie this comment.

40. Great Arrow reassigned Mr. Grant to a fourth crew, a bolt crew.

41. With no explanation or evidentiary basis, Mr. Grant's welding credentials had been rescinded. Great Arrow claimed to be justified in its decision to remove Mr. Grant as a welder, and reassign him to a lesser position.

42. Mr. Grant was the only welder who Great Arrow treated in this fashion. All the white welders employed by Great Arrow continued working in their chosen trade, and were not the target of harassing behavior.

43. As a member of this fourth crew, Great Arrow used Mr. Grant to complete any type of task that was needed. Great Arrow, and specifically Mr. Grant's new foreman "John," used this reassignment as an opportunity to continue harassing Mr. Grant.

44. Great Arrow ordered Mr. Grant to complete tasks that no other member of the fourth crew wished to complete. The tasks were humiliating, degrading and not the type of work for which Mr. Grant had been hired.

45. For example, one of the white crewmembers told Mr. Grant to fetch bolts and to hold the bolts while another white crewmember attached them to the assembly. The foreman, "John," accused Mr. Grant of delivering old and outdated bolts, and of failing to properly document the bolts in a so-called "bolt log."

46. Mr. Grant had never been informed of a bolt log, or any of the other procedures for which foreman "John" accused him of violating.

47. Great Arrow and foreman "John" noted the incident as a disciplinary issue, and demanded that Mr. Grant sign a disciplinary action form.

48. Mr. Grant refused to sign the disciplinary action form. Foreman "John" became combative, and incited verbal sparring between himself and Mr. Grant.

49. Foreman "John" publically denigrated Mr. Grant as "a worthless piece of shit," and reported Mr. Grant to Great Arrow's Labor Relations Strategy Management for insubordination.

50. According to Mr. Grant, Great Arrow's Labor Relations conducted an investigation, and concluded that Mr. Grant was not at fault for the incident.

51. Shortly thereafter, Great Arrow terminated Mr. Grant for lateness on two occasions during the prior 30-day period. The explanation was entirely pre-textural.

52. Mr. Grant indicated that he followed proper procedures on both occasions, calling his supervisor who accepted the explanation and ostensibly did not categorize the two incidents of lateness as a disciplinary issue.

53. Great Arrow's policy for lateness requires that the company provide the employee with both a verbal warning and a written warning *before* termination.

54. Great Arrow did not follow its own policy. Instead, Great Arrow fired Mr. Grant without any prior verbal or written warnings in regard to lateness.

55. Despite the numerous complaints lodged by Mr. Grant, Great Arrow's Labor Relations Strategic Management never conducted an adequate investigation.

56. Throughout his employment with Great Arrow, Mr. Grant was treated differently and worse than his white colleagues – in particular, white welders.

57. Great Arrow did not prevent white crewmembers – particularly, white welders – from working in their chosen trade, or utilizing their unique skillset; nor did Great Arrow reassign white crewmembers and welders for, *inter alia*, complaining to Labor Relations.

58. Likewise, Great Arrow did not terminate white crewmembers and welders for a small number of late arrivals, (i) without providing a verbal or written warning prior to such a termination, and (ii) for which the employee informed his supervisor beforehand.

59. Great Arrow had no justification for treating Mr. Grant different from his white colleagues, and for ultimately terminating his employment for pre-textual reasons. No basis exists in Mr. Grant's personnel file or elsewhere.

60. Any so-called "investigation" conducted by Great Arrow's Labor Relations, not only failed to comply with the company's own employment policies, it was grossly inadequate in the terms of gathering facts and involving Mr. Grant in the process.

61. Great Arrow intentionally retaliated against Mr. Grant for filing repeated complaints lodged with the company's Labor Relations Strategic Management by:

   (a) denying Mr. Grant a welding position for nearly five (5) months;

   (b) continually reassigning Mr. Grant to four (4) new crews in less than six (6) months of employment;

   (c) terminating Mr. Grant for two (2) latenesses in violation of company policy;

   (d) giving Mr. Grant a below-average performance evaluation of his workmanship, describing it as "terrible." All prior evaluations of Mr. Grant's workmanship were positive and satisfactory; and

   (e) forcing Mr. Grant to perform menial and degrading tasks beneath his skill set and experience level.

62. Mr. Grant remains unemployed after being fired by Great Arrow. Mr. Grant has been actively searching for jobs, however, has not yet been able to procure gainful employment.

63. Mr. Grant has lost wages and benefits because of Great Arrow's actions.

64. Mr. Grant has suffered, and will continue to suffer, mental anguish and emotional distress, the full amount of which is not yet known, as the result of Great Arrow's actions.

65. The intentional, outrageous, and egregious conduct of retaliating against Mr. Grant because he complained to Great Arrow's Labor Relations Strategic Management of the harassment and disparate treatment he suffered, which included, but was not limited to, terminating Mr. Grant's employment after he continued to suffer discriminatory and harassing treatment from supervisors and fellow employees, justify an award of punitive damages against Great Arrow.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Title VII, 42 U.S.C. §2000, *et seq*

66. Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 62, as if set forth fully herein.

67. By the actions of its employees and management, which are set forth in the preceding paragraphs of this complaint, Great Arrow unlawfully discriminated against Mr. Grant on the basis of race in the terms and conditions of his employment by allowing severe and/or pervasive harassment in the workplace, creating a hostile work environment, retaliating against him for complaining about this discrimination and harassment, and discharging him in retaliation for his multiple complaints of discrimination and harassment, all of which are in violation of Title VII, 42 U.S.C. §2000, *et seq*.

68. As a direct and proximate result of Great Arrow's violation of Title VII, 42 U.S.C. §2000, *et seq.*, Mr. Grant has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, and loss of enjoyment of life.

## SECOND CAUSE OF ACTION
### Violation of the PHRA, 43 P.S. §953, *et seq*.

69. Plaintiff hereby incorporates by reference the averments contained in Paragraphs 1 through 62, as if set forth fully herein.

70. By the actions of its employees and management, which are set forth in the preceding paragraphs of this complaint, Great Arrow unlawfully discriminated against Mr. Grant on the basis of race in the terms and conditions of his employment by allowing severe and/or pervasive harassment in the workplace, creating a hostile work environment, retaliating against him for complaining about this discrimination and harassment, and discharging him in retaliation for his multiple complaints of discrimination and harassment, all of which are in violation of the PHRA, 43 P.S. §955, *et seq*.

71. As a direct and proximate result of Great Arrow's violation of the PHRA, Mr. Grant has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, and loss of enjoyment of life.

### VII. PRAYER FOR RELIEF

72. WHEREFORE, Mr. Grant respectfully requests that this Honorable Court:

 (a) declare Great Arrow's conduct to be in violation of Mr. Grant's rights;

 (b) enjoin Great Arrow from engaging in such conduct in the future;

 (c) restore Mr. Grant to his rightful place and rank of employment;

 (d) award Mr. Grant equitable relief of back pay and benefits up to the date of reinstatement and front pay and benefits accrual;

(e) award Mr. Grant compensatory damages to which he is entitled for past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, damages for breach of contract, and any other compensatory damages;

(f) award Mr. Grant punitive damages to which he proves entitled;

(g) award Mr. Grant attorneys' fees and costs; and

(h) grant such other relief as it may deem just and proper.

## VIII. JURY DEMAND

73. Mr. Grant demands trial by jury on all claims and issues triable by a jury.

Respectfully submitted,

GOLDSTEIN LAW PARTNERS, LLC

Dated: November 30, 2020

By: /s/ Shawn M. Rodgers
Shawn M. Rodgers
Attorney I.D. No. 307598
srodgers@goldsteinlp.com
11 Church Road
Hatfield, PA 19440
(tel) 610.949.0444
(fax) 215.257.1910

*Attorneys for Plaintiff*