**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GREGORY GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:20-cv-01856 |
| v. | ) | |
| | ) | |
| GREAT ARROW BUILDERS, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

This case involves claims of race discrimination and retaliation in the workplace brought by Plaintiff, Gregory Grant ("Plaintiff"), against Defendant, Great Arrow Builders, LLC, ("Defendant" or "Great Arrow"). Before the Court is Defendant's Motion for Summary Judgment as to all claims (ECF No. 49). For the reasons stated below, the Defendant's Motion is GRANTED in full and summary judgment is granted in its favor.

## I. FACTUAL BACKGROUND[1]

In January 2019, Great Arrow Builders ("Great Arrow") hired Mr. Gregory Grant as a welder. (Defs.' Statement of Material Facts ("Defs.' SMF") ECF No. 51 ¶ 2; Pl.'s Response and

---

[1] The factual background is composed of the undisputed evidence in the record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As noted by Defendant, permeating Plaintiff's Response are assertions that are not supported with relevant record evidence, as required by Federal Rule of Civil Procedure 56(c)(1) and Local Rule 56(C)(1). For instance, Mr. Grant asserts that his re-test was unfairly administered and that he was "prevented" from finishing the exam and the only evidence cited to support these assertions is Mr. Grant's deposition testimony. (*See* Pl.'s Resp. ¶¶ 17–18; Pl's CSMF ¶¶4–5, 33–36.) Beyond Mr. Grant stating the inspector told him to stop working after an hour, Plaintiff does not provide any evidence showing that this was an unfair administration of the exam or that the inspector unjustly prevented Mr. Grant from working. (*See* Dep. of Mr. Grant, ECF No. 53-2, at 75:10–76:8.) Without further evidence, Mr. Grant's testimony that the re-test was unfair does not create a dispute of material fact. In accordance with Fed. R. Civ. P. 56(e), the Court only considers those genuine disputes of material fact properly noted and supported by Plaintiff. *See Laymon v. Honeywell Int'l Inc.*, No. 2:20-cv-01938, 2022 WL 17546527, *1 n.1 (W.D. Pa. Dec. 9, 2022); *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 286 n.2 (W.D. Pa. 2020).

Counterstatement of Disputed Material Facts ("Pl's Resp.", "Pl.'s CSMF") ECF No. 61 ¶ 1.) Mr. Grant worked on a major project for Shell in Beaver County, Pennsylvania. (Def's SMF ¶ 1.) Mr. Grant is an African American male and earned his welding certification by passing a welding exam administered by Great Arrow's parent company, Bechtel Corporation. (Pl's CSMF ¶¶ 1–2.) This lawsuit arises out of Mr. Grant's claims that during his employment with Great Arrow, it discriminated against him due to his race. (Compl., ECF 1.)

### A. Alleged Performance Issues and Revocation of Welding Credentials

At certain times during his employment with Great Arrow, Mr. Grant was supervised by Troy Dorris and Michael Harris. (Def's SMF ¶ 9; Pl's Resp. ¶ 9.) Mr. Dorris and Mr. Harris both testified that in the course of supervising Mr. Grant they identified deficiencies in Mr. Grant's welding work—stating that he failed to perform required pre-cleaning activities, produced undersized and undercut welds, and did not follow instructions—and gave Mr. Grant instructions and warnings related to the quality of his work. (Def's SMF ¶¶ 10–11.) Mr. Grant does not dispute that Mr. Dorris and Mr. Harris supervised him and that at least Mr. Harris "purportedly found deficiencies," however, Mr. Grant disputes whether his supervisors informed him of issues concerning the quality of his workmanship. (Pl's Resp. ¶¶ 10, 13, 14; Pl's CSMF ¶¶ 3, 36.)

Great Arrow assigned Mr. Grant to perform welding work in the fabrication shop ("fab shop"). (Def's SMF ¶ 12; Pl's CDMF ¶ 32.) Mr. Harris inspected Mr. Grant's work in the fab shop and testified that he found deficiencies in the welding, including "slag entrapment, porosity, excessive removal of bas material by grinding, and failure to identify the welds." (Def's SMF ¶ 13; Pl's Resp. ¶ 13.) It is disputed whether Mr. Harris informed Mr. Grant about the deficiencies he found in his work. (Def's SMF ¶ 14; Pl's CSMF ¶¶ 3, 36.)

Following Mr. Harris's inspection of Mr. Grant's work in the fab shop, Mr. Harris referred

Mr. Grant to a re-test of the welding examination. (Def's SMF ¶ 15; Pl's CSMF ¶ 4.) [2]  Mr. Grant failed the welding re-test. (Def's SMF ¶ 16; Pl's CSMF ¶ 5.)[3] Following the re-test, Mr. Dorris revoked Mr. Grant's welding certification. (Def's SMF ¶ 20; Pl's CSMF ¶ 5.)

Great Arrow asserts that Mr. Grant was required to complete more training before he could resume welding and that he was responsible for scheduling this training through his union, but he failed to take the initiative to do so. (Def's SMF ¶¶ 21–22.) Mr. Grant disputes these assertions but does not provide any explanation or counter assertions related to the training specifically. (*See* Pl's Resp. ¶¶ 21–22.)

Following the revocation of his welding certification, Mr. Grant continued working for Great Arrow as a member of the Bolt Crew. (Def's SMF ¶ 23; Pl's CSMF ¶¶ 6, 39.) Mr. Grant asserts that during his assignment to the Bolt Crew he was "forced to perform work outside his welding specialty" and work that he "was not accustomed to performing." (Pl's CSMF ¶ 6.) Mr. Grant suffered no reduction in pay or benefits. (Def's SMF ¶ 23; Pl's Resp. ¶ 23.)

### B.  Mr. Grant's Complaints During his Employment

While employed with Great Arrow, Mr. Grant filed two complaints with its Labor Relations Department. First, on May 7, 2019, Mr. Grant's former lawyer sent a letter to Great Arrow asking them to investigate Mr. Grant's claims that "Shell failed to provide Mr. Grant with a welding box [at] his orientation" and that he had been "harassed and retaliated against." (Def's SMF ¶ 24–25, 27.) The letter did not mention Mr. Grant's race or allege race discrimination. (*Id.*

---

[2] Mr. Grant asserts that the re-test was "unjustified" and that there was "no evidence of documented poor workmanship that is contemporaneous with the re-test." (Pl's Resp. ¶ 15.) However, Mr. Grant also states that "[i]t is undisputed that Mr. Harris inspected Mr. Grant's work and purportedly found deficiencies." (Pl's Resp. ¶ 13.) Mr. Grant does not provide any record evidence to indicate that there were *not* deficiencies in his welding or to support his general assertion that the re-test was unjustified.

[3] Mr. Grant asserts that the inspector administering the re-test "prevented" him from completing the examination and "arbitrarily" failed him. (Pl's CSMF ¶ 5.) Mr. Grant does not offer any affirmative evidence to support this assertion.

¶ 26.) Great Arrow asserts that in response to the letter, Labor Relations investigated and spoke to Mr. Grant's supervisors, Mr. Dorris and Mr. Harris, who shared that Mr. Grant had demonstrated poor welding skills and failed two welding tests. (*Id.* ¶ 29–30.) Labor Relations determined that Mr. Grant's allegations were unfounded. (*Id.*)

Mr. Grant does not dispute the contents of his previous lawyer's letter to Great Arrow. (Pl's Resp. ¶¶ 24–27.) Mr. Grant again disputes that his supervisors provided him with notice of poor workmanship and disputes the claim that Labor Relations made an adverse determination regarding his claims. (*Id.* ¶¶ 29–30.)

As to the welding box issue, Great Arrow asserts that it does not typically issue welding boxes at all to any employees who perform structural welding, like Mr. Grant. (Def's SMF ¶ 28.) In response, Mr. Grant states that he lacks knowledge of Great Arrow's policies and procedures concerning the issuances of welding boxes. (Pl's Resp. ¶ 28.)

Mr. Grant's second complaint to Great Arrow during his employment involved an incident in which he says that he was mistreated by another employee. Specifically, a welder named Mike told Mr. Grant, "you're not worth s***" and "you're a piece of s***. . . ." (Def's SMF ¶ 57; Pl's Resp. ¶ 57.) Mr. Grant reported this incident to the foreman and Labor Relations investigated. (Def's SMF ¶ 58; Pl's Resp. ¶ 58.) Great Arrow avers that in response to this incident, Mr. Grant was moved to a different work area. (Def's SMF ¶ 60.) Mr. Grant disputes whether Great Arrow took action in response to his complaint about this incident. (Pl's Resp. ¶ 58–60.)

### C. **Incident with Supervisor Michael Buchanan**

Mr. Grant and a Great Arrow General Foreman, Michael Buchanan, had a verbal altercation in August 2019. (Def's SMF ¶¶ 33–43; Pl's CSMF ¶¶ 22–26.) Great Arrow asserts that this incident occurred after Mr. Buchanan met with Mr. Grant and other employees on a certain

assignment because the work was not done correctly, and it "incorporated reused bolts that were not tensioned." (Def's SMF ¶¶ 31–32.) According to Great Arrow, Mr. Grant told Mr. Buchanan that Mr. Grant had obtained new bolts from the inventory room, but Mr. Buchanan investigated this claim and determined it was false based on the sign-in sheet in the inventory room. (*Id.* ¶¶ 34–36.) Great Arrow asserts that Mr. Grant became upset and shouted expletives at Mr. Buchanan when Mr. Grant was confronted with this information. (*Id.* ¶¶ 37, 39, 40.) Mr. Buchanan reported Mr. Grant to Labor Relations for his statements, which were a Category III violation of Great Arrow's work rules.[4]  (Def's SMF ¶¶ 41, 43.)

According to Mr. Grant's version of the incident, Mr. Buchanan reprimanded Mr. Grant for his performance related to the Bolt Crew and, during the verbal altercation, Mr. Buchanan disrespected and cursed at Mr. Grant. (Pl's CSMF ¶¶ 23, 25.) Mr. Grant further asserts that Mr. Buchanan had indicated that he intended to reprimand the entire crew, but Mr. Grant was the only person who was written up. (*Id.* ¶ 26.)

### D. <u>Attendance Issues</u>

On August 29, 2019, Mr. Robertson, a superintendent at Great Arrow, saw Mr. Grant walking toward the lunch tents at 11:49 a.m. and Mr. Grant indicated that he was going to lunch—even though the lunch period began at 12:00 p.m. (Def's SMF ¶¶ 44–45; Pl's CSMF ¶¶ 20–21.) Mr. Robertson told Mr. Grant to return to work and reported this incident to Labor Relations as a Category III violation for the work rules, since Mr. Grant was leaving the workplace without a supervisor's permission. (Def's SMF ¶¶ 46–48; Pl's CSMF ¶ 21.)

---

[4] Section 9.2.3 of Great Arrow's work rules list Category III infractions and state that "Category III infractions range from written warning to suspension/termination for the 1st Infraction." The column labeled, "1st Infraction," states that "A written warning may be issued and possible suspension or termination from Great Arrow Builders for up to thirty (30) days." This section of the work rules listed Category III infractions to include "leaving the workplace without supervisor's permission," "inappropriate and offensive comments or behavior, including malicious use of social media," and "attendance infractions." (Def's SMF ¶ 6.)

Upon looking into this incident, Labor Relations discovered that Mr. Grant had "a pattern of unscheduled and unapproved late arrivals, which ranged from 1.5 hours to 5 hours, along with two unscheduled and unapproved clock-outs (early quits), which [occurred] several before his shift ended." (Def's SMF ¶ 49.) According to Great Arrow, Mr. Grant's attendance violations amounted to a Category III violation of the work rules and Labor Relations concluded that "Mr. Grant's conduct showed serious disrespect for supervision and disregard for his work responsibilities." (Def's SMF ¶¶ 50–51.) Mr. Grant disputes this claim, asserting that he had only two late arrivals during his employment. (Pl's Resp. ¶ 49; Pl's CSMF ¶¶ 8–19.) Moreover, Mr. Grant asserts that he never received any written warnings regarding his attendance, which he says was required by the Employee Manual.[5] (Pl's CSMF ¶ 50.) Mr. Grant further asserts that the attendance records are inaccurate because Mr. Grant's crew code changed several times during his employment. (*Id.*)

### E.  Terminating Mr. Grant's Employment

On September 6, 2019, Labor Relations met with Mr. Grant and his union representative and issued a written warning that detailed his infractions. (Def's SMF ¶ 53.) Mr. Grant asserts that he was never provided a written warning and that the only paperwork of record presented to Plaintiff was his termination notice. (Pl's Resp. ¶ 53.) Great Arrow avers that during the September 6, 2019, meeting, Mr. Grant gave no indication that he would be willing or able to change his behavior and, as a result, Great Arrow terminated Mr. Grant's employment. (Def's SMF ¶¶ 54–55.) Mr. Grant does not dispute that Great Arrow's Labor Relations conducted an internal investigation and concluded that termination was justified, but Mr. Grant asserts without advancing evidence that there is a dispute over whether this conclusion was "pretextual and

---

[5] Section 4.2 of Great Arrow's Employee Manual provides "Employees who accumulate three (3) unexcused absences, late arrivals and/or early departures (in any combination) within a four (4) week rolling period will receive a written warning." (Pl's CSMF ¶ 9.)

supported by *all* available facts." (Pl's Resp. ¶¶ 51–54.)

## II.   PROCEDURAL BACKGROUND

On November 30, 2020, Mr. Grant filed his Complaint in this case (ECF No. 1) against Great Arrow alleging race discrimination and retaliation in violation of Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e), *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, and demanding a jury trial.[6] Specifically, Plaintiff alleges that Defendant "unlawfully discriminated against Mr. Grant on the basis of race in the terms and conditions of his employment by allowing severe and/or pervasive harassment in the workplace, creating a hostile work environment, retaliating against him for complaining about this discrimination and harassment, and discharging him in retaliation for his multiple complaints of discrimination and harassment." (ECF No. 1 ¶¶ 67, 70.)

On February 1, 2021, Great Arrow filed its Answer (ECF No 9). On May 2, 2022, after discovery, Defendant filed the instant Motion for Summary Judgment (ECF No. 49) as to all claims, and Plaintiff filed a Response in opposition on June 1, 2022 (ECF No. 52). On June 15, 2022, Defendant filed a Reply (ECF No. 55).

On July 21, 2022, the Court granted Plaintiff's Motion to Correct the Response and Counterstatement of Disputed Material Facts and Ordered Defendant to file an Amended Counterstatement of Facts, and, if desired, an amended Reply brief, that addresses Plaintiff's amended filings. (ECF No. 59.) On July 25, 2022, Plaintiff filed the Amended Response and Counterstatement of Disputed Material Facts (ECF Nos. 60, 61.) On August 9, 2022, Defendant

---

[6] Under Pennsylvania Human Relations Act ("PHRA"), it "shall be an unlawful discriminatory practice . . . for any employer because of race . . . to otherwise discriminate" against an employee. 43 P.S. § 955(a). Pennsylvania interprets the PHRA in the same manner as the federal law under Title VII. *See Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–84 (3d Cir. 1995) ("The state Act is construed consistently with interpretations of Title VII") (internal citations omitted).

filed an Amended Reply Brief (ECF No. 62.) Thus, the Defendant's Motion for Summary Judgment is ripe for disposition.

**III.** **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *Boyle v. Cnty. of Allegheny,* 139 F.3d 386, 393 (3d Cir. 1998). Instead, the court must consider the evidence and all reasonable inferences which may be drawn from it in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, "[a]lthough courts are to resolve any doubts as the existence of genuine issues of fact against the part[y] moving for summary judgment, Rule 56(e) does not allow a party resisting" a summary judgment motion "to rely merely upon bare assertions, conclusory allegations[,] or suspicions." *Fireman's Ins. Co. v. Dufresne*, 676 F.2d 965, 969 (3d Cir. 1982). When a party with the burden of proof fails to produce sufficient record evidence that would plausibly prove their claim at trial, summary judgment may be granted. *Saldana v. K-Mart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). And when the non-moving party bears the burden of proof on an issue, it may not merely rely on the allegations in its pleadings to survive summary judgment but must set forth sufficient record facts showing that there is a genuine issue for trial. *Id.*

## IV.   __DISCUSSION__

Upon careful review of the briefs and the record, the Court concludes that—even when viewing all disputed facts in the light most favorable to Plaintiff, as required at the summary judgment stage—the record could not reasonably be understood to support the inference that Plaintiff is entitled to relief on any of the claims.

### A. __RACE DISCRIMINATION__

#### i.    The *McDonnell Douglas* __Framework__

Racial discrimination may be established by direct or indirect evidence. *E.E.O.C v. Hall's Motor Transit Co.*, 789 F.2d 1011, 1015 (3d Cir. 1986). Since this is an employment discrimination case in which no direct evidence of discrimination is presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the pending Motion.

The *McDonnell Douglas* analysis proceeds in three steps. First, the plaintiff must establish *a prima facie* case of illegal discrimination. *McDonnell Douglas,* 411 U.S. at 802. To establish a *prima facie* case at the summary judgment stage, "the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case." *Duffy v. Paper Magic Grp.,* 265 F.3d 163, 167 (3d Cir.2001). Generally speaking, in order to establish a *prima facie* case of racial discrimination, the plaintiff must demonstrate that: (1) he was a member of a statutorily-protected class;  (2) he was qualified for the position at issue; (3) he was aggrieved by an adverse employment action, such as being fired or not hired; and  (4) similarly situated persons who were not members of his protected class were treated more favorably, or there are other circumstances giving rise to an inference of racial discrimination. *Jackson v. Univ.*

*of Pittsburgh,* 826 F.2d 230, 233 (3d Cir.1987), *cert. denied,* 484 U.S. 1020; *Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 410–411 (3d Cir. 1999); *Burdine,* 450 U.S. at 258.

Second, if the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *McDonnell Douglas*, 411 U.S. at 802–803; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 (1978) (a *prima facie* case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant); *Burdine,* 450 U.S. at 254–255.

Third, if the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reason given by the defendant for such treatment is merely a pretext for unlawful employment discrimination, *i.e.*, a discriminatory animus was the real reason for the adverse employment action at issue. *McDonnell Douglas,* 411 U.S. at 804–805; *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994). Specifically, to defeat summary judgment when the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, "a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes,* 32 F.3d at 764 (emphasis in original). Therefore, "if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case." *Id.*

While the burden of production may shift, "[t]he ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 252–53. The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous, *Burdine,* 450 U.S. at 253, and the elements of a *prima facie* case depend on the facts of the particular case, *see Jones,* 198 F.3d at 411; *Sarullo v. United States Postal Service,* 352 F.3d 789, 797–98 (3d Cir.2003) (the *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied").

### ii.   Mr. Grant Has Not Established a *Prima Facie* Case of Race Discrimination

The first three elements of the *prima facie* case are undisputed here: It is undisputed that (i) Mr. Grant is African American and, thus, a member of a statutorily protected class; that (ii) Mr. Grant was a qualified welder when he was hired by Great Arrow; and that (iii) Mr. Grant suffered an adverse employment action when Great Arrow terminated his employment. (ECF No. 54, at 6.) Thus, the dispute here is whether there is evidence upon which a reasonable factfinder could conclude that either similarly situated persons who were not members of his protected class were treated more favorably, or there are other circumstances giving rise to an inference of racial discrimination. *See Jackson,* 826 F.2d at 233; *Jones*, 198 F.3d at 410–11.

Mr. Grant advances two arguments to establish this element of the *prima facie* case: (1) "the suspicious circumstances of Great Arrow's revocation [of Mr. Grant's welding certification]"; (2) "Mr. Grant's [] disparate treatment as evidenced by his crew reassignment." (*See* ECF No. 54, at 7.)  Great Arrow argues that the circumstances under which Mr. Grant's welding certification was revoked were not suspicious. Rather, Great Arrow avers that the basis for first transferring Mr. Grant to the fab shop then, more notably, subjecting him to a re-test of the welding examination was because his supervisors, Mr. Dorris and Mr. Harris, found quality issues with the welds he produced. (ECF No. 62, at 1–2 (citing Ex. 2 Dorris Decl. ¶ 6; Ex. 3, Harris Decl. ¶ 4).)

While Mr. Grant did not admit that there were in fact deficiencies in his work, he has failed to offer any affirmative evidence, including testimonial evidence, to create an issue of fact as to the claim that he produced low quality welds or that the decision to refer him to a re-test of the welding examination was motivated by his race. More specifically, Mr. Grant never directly contradicted the claim that his welds were not pre-cleaned, were undercut and undersized, were not identified, had slag entrapment, were porous, and had an excessive amount of base material removed. (*See* Dep. of Mr. Grant ("Grant Dep."), ECF No. 53-2.) Instead, Mr. Grant only disputed the averment that he was *informed* about any deficiencies in his work and asserted that not being informed of deficiencies in his work was violative of Great Arrow's policy. (Grant Dep., 160:5–7; ECF No. 54, at 6.) Even taking it as true that none of Mr. Grant's supervisors informed him about the issues they found in his work, there is no evidence upon which a factfinder could connect Mr. Grant's referral to a re-test of the welding examination to unlawful racial animus, or to call into question that his supervisors actually identified the flaws in his work. And as a matter of logic, Mr. Grant certainly was aware that he was required to take a welding re-test—necessarily making him well aware that management had an issue with his welding work.

Mr. Grant then argues that the re-test of the welding examination was unfairly administered because he was "prevented" from completing the re-test. (ECF No. 54, at 7.) However, Mr. Grant's deposition testimony does not support this assertion. Instead, his testimony about the re-test is consistent with Great Arrow's argument that Mr. Grant failed the re-test because of his *performance* during the examination. Specifically, Mr. Grant testified that he was "a good hour" into the re-test exam and was "almost finished" with the overhead portion when the inspector "came in and [] looked" and told Mr. Grant, "you might as well take that down . . . you're not going to pass." (Grant Dep. 75:15–25.) The fact that Mr. Grant had been working for an hour, that

he was almost done with the first portion, and that the inspector reviewed his work before failing Mr. Grant, does not, in the Court's view, demonstrate circumstances upon which a reasonable factfinder could infer racial discrimination. This is especially true considering the undisputed fact that many welders fail the welding examination that Mr. Grant took—indicating the difficulty of the exam and that it is not out of the norm for the inspector to fail someone. (Def's SMF ¶ 17; Pl's Resp. ¶ 17.) And if the performance of the test revealed that it had been failed prior to its conclusion, it is not evidence of pretext or unlawful discrimination to end an already failed test early.

Finally, Mr. Grant argues that Great Arrow's disparate treatment is evidenced by Mr. Grant's crew assignments. Specifically, Mr. Grant argues that the crew assignments indicate disparate treatment on the basis of race because at the time of Mr. Grant's employment, only three (3) out of eighteen (18) crew members assigned to the fab shop were Black/African American.[7] (ECF No. 54, at 7.) After Mr. Grant had his welding credentials revoked, he was transferred to the Bolt Crew in which Black/African American crew members were the majority. (*Id.* at 8.) Great Arrow does not dispute the facts related to the crew assignments but argues that this is not enough to create an inference of disparate treatment. Specifically, Great Arrow highlights that Mr. Grant offers no evidence to demonstrate that similarly situated non-Black crew members were treated more favorably than him. (ECF No. 62, at 4.)

Mr. Grant also argues that the record shows that Great Arrow either destroyed or failed to preserve records of its crew and employee assignments, thus, the documentation of crew assignments produced for discovery is "likely" not accurate and a factfinder is entitled to draw a negative inference from the asserted poor record keeping and lack of documentation. (ECF No.

---

[7] Of the fifteen (15) non-Black crew members, eleven (11) members were white. (ECF No. 54, at 7.)

54, at 8.) Great Arrow accurately responds to this argument by highlighting that there can only be a negative inference if there is evidence of spoliation of evidence. (ECF No. 2, at 5 n.4.) "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020). An adverse, or negative, inference is a remedy to the spoliation of evidence "based on 'the common sense observation that when a party destroys evidence that is relevant to a claim or defense in a case, the party did so out of the well-founded fear that the contents would harm him.'" *Id.* (quoting *Mosaid Techs., Inc. v. Samsung Elecs Co., Ltd.*, 348 F. Supp. 2d 332, 336 (D.N.J. 2004)). But here, because there is no evidence that Great Arrow destroyed or altered its business records in the face of pending or reasonably foreseeable litigation, such an inference is not warranted here.

The Court also concludes that Mr. Grant has failed to identify similarly situated non-Black employees who were treated more favorably than him in similar circumstances. In his response to Great Arrow's Statement of Material Facts, Mr. Grant asserts that "[t]his treatment [revoking his welding credentials and transferring to bolt crew] did not occur with the other white welders on his crew. . . ." (Pl's Resp. ¶ 57.) However, Mr. Grant did not point to any specific non-Black welders in the crew to which he is referring to who were producing similar low-quality welds or engaged in similar conduct to Mr. Grant. Without such evidence, Mr. Grant has failed to demonstrate that employees who were "similarly situated" in "all relevant respects" were nonetheless treated differently and more favorably than him. *See Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx. 220, 222 (3d Cir. 2009) ("Which factors are relevant is determined by the context of each case, but often includes a 'showing that two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such

14

differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'")

Identifying a similarly situated employee is not the only way to establish a *prima facie* case of discrimination: "evidence of other circumstances demonstrating that the adverse employment action was 'based on an illegal discriminatory criterion' is sufficient to meet plaintiff's burden." *See Dawson v. Harran*, No. 08-cv-7, 2009 WL 2431343, at *7 (E.D. Pa. Aug. 6, 2009) (citing *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 356 (3d Cir. 1999). Mr. Grant, however, has not put forth evidence of circumstances demonstrating that the adverse employment action was taken based on Mr. Grant's race. Raw numerical comparisons of the racial composition of Great Arrow's crews, without "any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period," is not probative of Great Arrow's alleged discriminatory motive. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 543 (3d Cir. 1992) (citing *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir. 1991), *cert. denied*, 502 U.S. 861 (1991) (holding that statistics showing small percentage of minority faculty members are inadequate absent some other indication of relevance); *Molthan v. Temple Univ.*, 778 F.2d 955, 963 (3d Cir. 1985) ("Because the considerations affecting promotion decisions may differ greatly from one department to another, statistical evidence of a general underrepresentation of women in the position of full professor adds little to a disparate treatment claim.")).

The evidence in the record—that Mr. Dorris and Mr. Harris found deficiencies in Mr. Grant's work and that the welding examination inspector failed Mr. Grant after he had spent an hour performing the exam—supports only an inference that Mr. Grant's supervisors took actions based on the quality of Mr. Grant's welding. And the raw data about the racial composition of the "fab crew" compared that of the "Bolt Crew" does not demonstrate that the decision-making

process of Mr. Grant's supervisors and the welding examination inspector was driven by racial animus. *See O'Toole v. Acosta*, No. 14-cv-2467, 2018 WL 1469045, at *22 (N.D. Ill. Mar. 26, 2018) ("Showing that discrimination motivated an employer's actions becomes 'difficult' where the action, as here, involves multiple decision-makers.")

Since Mr. Grant has failed to advance evidence upon which a factfinder could conclude that similarly situated non-Black employees were treated more favorably in similar circumstances or that the circumstances otherwise give rise to an inference of racial discrimination, the Court concludes that Mr. Grant has not established a *prima facie* case of race discrimination.

### iii.   Great Arrow Has Advanced Legitimate Non-Discriminatory Reasons for Terminating Mr. Grant's Employment

Even assuming Mr. Grant had established a *prima facie* case of illegal discrimination, the burden would then shift to Great Arrow to articulate a legitimate, nondiscriminatory reason for treating him in an adverse manner. *See McDonnell Douglas,* 411 U.S. at 802. An employer's burden of production is relatively light and is satisfied by introducing evidence which, taken as true, would permit the conclusion that there was a legitimate, non-discriminatory reason for the unfavorable employment decision. *Fuentes*, 32 F.3d at 763. Great Arrow argues that it had legitimate, nondiscriminatory reasons to terminate Mr. Grant's employment based on his misconduct. (ECF No. 50, at 12.) Specifically, Great Arrow cites the fact that Mr. Grant made inappropriate and offensive comments when he shouted expletives at his general foreman, constructed a platform structure incorrectly by incorporating reused bolts that were not tensioned, and repeatedly violated Great Arrow Builder's attendance policy, including leaving the work area early for lunch. (*Id.* at 12–13.)

Great Arrow has advanced record evidence to support each of these proffered reasons for terminating Mr. Grant's employment. Most notably, included in Mark Selbert's (Great Arrow's

Labor Relations Strategic Manager's) Declaration is the written report from Michael Buchanan, about his verbal altercation with Mr. Grant on August 24, 2019. (ECF No. 51-1, at 40.) In this report, Mr. Buchanan—the general foreman who supervised Mr. Grant's work—describes how Mr. Grant shouted expletives at him including "f*** you" and "you aren't s***." (*Id.*) This incident plainly constitutes a "Category III" violation of Great Arrow's work rules, which include "[i]nappropriate and offensive comments or behavior." (*Id.* at 27.) Great Arrow's work rules also state that "[c]ategory III infractions range from written warning to suspension/termination for the 1st infraction" and under the "1st infraction" column the rules that "[a] written warning may be issued and possible suspension or termination from Great Arrow Builders for up to thirty (30) days." (*Id.*)

The Court agrees with Defendant that the uncontroverted evidence of record is that given its "Category III" status, the August 24, 2019, verbal altercation between Mr. Grant and Mr. Buchanan "alone provided sufficient support for Great Arrow Builders' termination decision." (ECF No. 62, at 7.) The Court further agrees with Defendant that the other two "issues" listed on Mr. Grant's termination notice—the August 29, 2019, incident in which Mr. Grant left early for lunch and the list of five attendance infractions—are also supported by undisputed record evidence. (ECF No. 53-8; ECF No. 62, at 7–9.) Specifically, it is undisputed that Mr. Grant left early for lunch without permission from his supervisor, which constituted a Category III, No. 5 infraction (ECF No. 62, at 9.) It is also undisputed that Great Arrow's attendance records indicate that Mr. Grant had accumulated several attendance violations, which separately amounted to a Category III, No. 10 violation (*Id.* at 7–8.) Thus, the Court concludes that Great Arrow has more than satisfied its burden to advance a legitimate, non-discriminatory reason for terminating Mr. Grant's employment on September 6, 2019.

### iv. Mr. Grant Has Failed to Demonstrate that Great Arrow's Legitimate Reasons for His Dismissal Could Be Reasonably Found to Be a Pretext for Race Discrimination

Since Great Arrow established legitimate, nondiscriminatory reasons for terminating Mr. Grant's employment, the burden then shifts back to Mr. Grant to demonstrate that the reasons given by Great Arrow are merely pretext for unlawful employment discrimination (*i.e.*, racial discriminatory animus was the real reason for terminating his employment). *McDonnell Douglas,* 411 U.S. at 804–805. To defeat summary judgment at the pretext stage, a plaintiff must point to record evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764.

Here, Mr. Grant does not dispute the facts of the incident with Mr. Buchanan but rather argues that "the finder of fact could conclude that the level of disciplinary action taken— termination—for this lone incident was a pretext and disproportionate to the offense, especially given that Plaintiff had no prior disciplinary warnings in his file." (ECF No. 54, at 14.) But Mr. Grant's own assertion that this level of disciplinary action is "too severe" on its own is not enough to demonstrate that Great Arrow's proffered reason is pretext. *See Fuentes*, 32 F.3d at 765 (explaining that a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons, such that "that a reasonable factfinder could rationally find them unworthy of credence," and infer that the defendant did not act for the stated non-discriminatory reasons). *See also Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (explaining that the role of a court is not to determine "whether the employer made the best, or even a sound, business decision; it is whether

the real reason is [discrimination]." (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996) (alteration in original)). Mr. Grant's subjective disagreement with or characterization of Great Arrow's employment decisions are insufficient to oppose Great Arrow's summary judgment motion.

Mr. Grant also does not offer any evidence to otherwise demonstrate that "an invidious discriminatory reason was more likely than not a motivating or determinative cause" of Great Arrow's decision. *See Fuentes*, 32 F.3d at 764. Mr. Grant argues that "[t]he altercation itself is evidence that Great Arrow put Mr. Grant in an unfamiliar position and orchestrated his inevitable failure—perhaps anticipating that tensions often are exacerbated when employees are placed in an untenable job function." (ECF No.54, 13–14.) This assertion does not provide a factfinder with any evidence to find that racial animus was a motivating factor for terminating Mr. Grant's employment. If anything, this line of argument only explains Mr. Grant's own motivation for shouting expletives at his general foreman. And, beyond that, Mr. Grant's argument on this point relies on his own speculation without evidentiary support.

The record facts regarding the incident between Mr. Buchanan and Mr. Grant are undisputed. Mr. Grant shouted expletives at Mr. Buchanan including "f*** you" and "you aren't s***." (ECF No. 51-1, at 40.) Mr. Grant attempts to establish pretext by arguing that termination is too severe a punishment for this behavior, but Mr. Grant has not provided any evidence to show that Great Arrow's course of action was inconsistent with its internal policy, was disparately applied, or otherwise was motived by discriminatory animus. In other words, Mr. Grant has failed to provide evidence upon which a factfinder could disbelieve Great Arrow or believe that a discriminatory animus was more likely than not a motivating cause for Great Arrow to terminate Mr. Grant's employment. *See Fuentes*, 32 F.3d at 764.

As to the other two "issues" listed on Mr. Grant's termination notice—the August 29, 2019, incident in which Mr. Grant left early for lunch and a list of five attendance infractions—the Court also concludes that Mr. Grant has failed to proffer evidence that could support a jury conclusion that either of these issues are pretext for his dismissal. Regarding the lunch incident, Mr. Grant does not controvert that it happened. (Pl's Resp. ¶¶ 44–48.) His argument goes only to its classification. (*See id.*) He then asserts that the August 29, 2019, lunch incident was inaccurately listed as a Category III infraction on the termination notice and only constitutes a Category II infraction. (ECF No. 54, at 11.) Mr. Grant also states that this "misclassification" is not consistently applied to all employees, "including white welders who were not terminated in the fashion Mr. Grant was terminated." (Pl's Resp. ¶ 47.) Mr. Grant, however, fails to offer any evidence to support these assertions. Mr. Grant cites to Mr. Selbert's deposition testimony, but Mr. Selbert unequivocally testified that under Great Arrow's policy leaving early for lunch without permission constitutes a Category III, No. 5 infraction: "leaving the work place without supervisor's permission." (Dep. of Mr. Mark Selbert, ECF 53-4, at 100:5–11.) Mr. Selbert even specified that "[i]f you were supposed to be in, like, the Fab Shop and you're on the road walking to lunch, you're outside of your work area, workplace"—describing Mr. Grant's lunch incident in the language of Great Arrow's work rules corresponding to Category III, No. 5. (*Id.* at 100:17–20.) Further, Mr. Grant offers no citation or record support for the assertion that this infraction is inconsistently applied to other employees, let alone to "white welders." Thus, the Court concludes that Mr. Grant's argument could not plausibly support a pretext finding.

Regarding the attendance infractions, Mr. Grant asserts that he only arrived late twice, and that Great Arrow's attendance records are inaccurate. (*Id.* at 9–11.) Again, Mr. Grant has not offered any affirmative evidence to support his assertions regarding his attendance record or to

contradict the records provided by Great Arrow. Mr. Grant does not directly challenge the other listed attendance records in his deposition testimony and instead focuses on arguing that the attendance records are inaccurate, and that Great Arrow did not provide him with a written warning for his attendance violations. (Pl's Resp. ¶¶ 49–50.) Again, Mr. Grant has failed to provide record evidence upon which a factfinder could credit his assertions, discredit Great Arrow's, or otherwise plausibly conclude that a discriminatory animus was more likely than not a motivating cause in place of the proffered reasons for terminating Mr. Grant's employment. *See Fuentes*, 32 F.3d at 764 (internal citations omitted).

In sum, even if Mr. Grant could show a *prima facie* case, he has not advanced record evidence sufficient to show pretext under either prong of *Fuentes*. Therefore, Mr. Grant's race discrimination claims fail as a matter of law, and summary judgment will be entered in favor of Great Arrow.

### B.  HOSTILE WORK ENVIRONMENT

In addition to the race discrimination claims, Mr. Grant also claims that he was subjected to a hostile work environment due to his race. (ECF No. 1 ¶¶ 67, 70.) To make a *prima facie* case of hostile work environment, a plaintiff must establish the following five elements: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same race in his position; and (5) there is a basis for employer liability." *Fenter v. Mondelez Glob., LLC*, 574 Fed. App'x 213, 217 (3d Cir. 2014) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996)).

In its Motion for Summary Judgment, Great Arrow argues that Mr. Grant cannot prove the essential elements of a hostile environment claim because he has not proffered any evidence that

he suffered any negative race-based conduct—"let alone negative conduct of that or any type rising to the 'severe or pervasive' level"—and, even if he had, he has proffered no evidence that Great Arrow could be held responsible for such conduct. (ECF No. 50, at 13–14).

In response to the Motion for Summary Judgment, Mr. Grant did not directly respond to the hostile environment claims. (*See* ECF Nos. 52, 54, 61.) Because Mr. Grant fails to offer argument, or explicitly advance record facts, in support of his hostile work environment claim, it is not clear which record facts form the basis of his hostile environment claim. Based on the Court's review of the record, there is nothing obvious from the record that would support the inference that Mr. Grant suffered hostile workplace treatment, particularly any that rose to the severe and pervasive degree as to constitute a hostile work environment.

As a matter of law, a hostile work environment claim is actionable only if it is so severe or pervasive that it "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (second alteration in original) (internal quotation marks omitted); *see Glanzman v. Metro. Mgmt. Corp.*, 290 F. Supp. 2d 571, 581 (E.D. Pa. 2003) ("[T]o be successful in such hostile environment actions, a plaintiff must demonstrate that the workplace is 'permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))). The environment must be objectively hostile, not only hostile in the plaintiff's view. *See Harris*, 510 U.S. at 21; *Breeden*, 532 U.S. at 270–71. In making this determination, a court must consider the "totality of the circumstances," including "the frequency of [allegedly] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Bronco Oilfield Servs.*, 503 F. Supp. 3d at 298 (internal quotation marks omitted) (quoting *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93 (3d Cir. 2014)).

With that backdrop, the Court concludes that as a matter of law none of Mr. Grant's claims regarding his treatment at work rise to the level of "severe or pervasive" such that a reasonable jury could find for him on the issue of hostile environment. The one incident of harassment alleged by Mr. Grant, in which a non-supervisor welder named "Mike" told Mr. Grant, "you're not worth s***" and "you're a piece of s***. . . ," has no related evidence attributing the harassment to racial animus. Beyond this lone incident, there is no evidence in the record that Mr. Grant was targeted, humiliated, threatened, deprived of opportunities, or treated differently because of his race with such frequency or severity as to constitute an alteration of the terms and conditions of his employment or which could be defined as "severe or pervasive."

In any event, by not responding to Great Arrow's Motion for Summary Judgment, Mr. Grant abandoned his hostile work environment claims. Defendant's Motion for Summary Judgment plainly states that it is seeking summary judgment as to Plaintiff's hostile environment claims. (ECF No. 49 ¶ 3.) Mr. Grant's opposition filings do not include any direct reference or substantive discussion of his hostile environment claims. This failure to respond substantively to Great Arrow's Motion for Summary Judgment on the hostile work environment claim amounts to an abandonment those claims, and the entry of summary judgment as to those claims is appropriate in light of the record advanced by the Defendant. *See, e.g.*, *McCarthy v. Int'l Assoc. of Machinists & Aerospace Workers*, No. 21-1673, 2021 WL 5766569, at *2 n.3 (3d Cir. Dec. 6, 2021) ("Plaintiffs abandoned their claims . . . by omitting any reference to them in their opposition to Defendants' motion for summary judgment.); *Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486,

511–12 (E.D. Pa. 2018) (considering a claim abandoned when not addressed in brief in opposition to summary judgment).

### C. <u>RETALIATION</u>

Finally, Great Arrow seeks summary judgment as to Mr. Grant's retaliation claims. Retaliation claims proceed under the same general *McDonnell Douglas* framework described above. *See Carvalho-Grevious v. Del. St. Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). To establish a *prima facie* case of unlawful retaliation, a Plaintiff must show that he (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action either after or contemporaneous with his protected activity; and (3) a sufficient causal connection between his protected activity and the employer's adverse action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). In its Motion for Summary Judgment, Great Arrow argues that Mr. Grant cannot prevail on his retaliation claim because he did not engage in a statutorily protected activity and, even if he did, he has not provided evidence of a causal link between such protected activity and the termination of his employment. (ECF No. 50, at 18–20.)

In response to the Motion for Summary Judgment, Mr. Grant did not directly respond to the Defendant's argument as to his retaliation claims. (*See* ECF Nos. 52, 54, 61.) Because Mr. Grant fails to offer argument, or explicitly advance record facts, in support of his retaliation claim, it is not clear which record facts demonstrate that Mr. Grant engaged in a protected activity—the first element of the retaliation claim. While employed with Great Arrow, Mr. Grant's former lawyer sent Great Arrow a letter complaining about Mr. Grant not receiving a welding box during orientation and stated that Mr. Grant had "harassed and retaliated against." (ECF No. 51-1, at 36–37.) This letter did not detail any specific incidents of harassment or retaliation, nor did it mention Mr. Grant's race or attribute any such incident to Mr. Grant's race. (*See id.*) Regarding the welding

box specifically, Mr. Grant concedes that he lacks knowledge of Great Arrow's policies and procedures concerning the issuance of welding boxes, including its unrebutted evidence that such are not routinely provided to welders performing the work assigned to Mr. Grant. (Def's SMF ¶ 28; Pl's Resp. ¶ 28.)

As a matter of law, to be a protected activity, complaints made to an employer must be sufficiently specific to put the employer on notice of the specific kind of unlawful discrimination being alleged and being complained of. *See Stone v. Trader Joe's Co.*, 186 F. Supp. 3d 395, 403 (E.D. Pa. 2016). Though context can suffice to fill gaps, "a general complaint of unfair treatment is insufficient" to constitute protected activity. *Curay-Cramer v. Ursuline Acad. of Wilmington Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006); *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 287–88 (3d Cir. 2010) ( holding that plaintiff's complaint to coworkers over lunch that he was being discriminated against, harassed, and bullied was "too vague to constitute protected activity"); *Barber v. CSX Dist. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995) (stating plaintiff's formal letter to HR questioning hiring decision and stating that plaintiff was "puzzled as to why the position was awarded to a less qualified individual" but not specifically complaining of age discrimination does not constitute a protected activity for ADEA retaliation purposes). Thus, based on the Court's review of the record, the letter sent to Great Arrow by Mr. Grant's former lawyer does not constitute a protected activity.

But even if the letter did constitute protected activity, Mr. Grant has not advanced sufficient record evidence to support the inference that his complaint in this letter was the cause, let alone the "but-for" cause, of his termination. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 359–60 (2013) (holding that Title VII retaliation claims must be proved according to the traditional principles of but-for causation). As the Court concluded above, Great Arrow has sufficiently

25

proffered record evidence that Mr. Grant was terminated for a legitimate, non-discriminatory reason. The letter from Mr. Grant's former attorney regarding his welding box was dated May 7, 2019—four months prior to Mr. Grant's termination on September 6, 2019. As Great Arrow highlights, four months is not a short enough time to be "unusually suggestive" of an implicit causal link between the letter and Mr. Grant's termination. (ECF No. 50, at 19–20 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (internal citations omitted) ("[A] gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Breeden*, 532 U.S. at 273–74 (2001) (per curiam) (internal citations omitted) (holding that temporal proximity between employer's knowledge of protected activity and adverse employment action "must be 'very close,'" and observing that three- and four-month gaps are "insufficient"); *Jones*, 796 F.3d at 331 (rejecting employee's "suggestion that a gap of nearly three months . . . raises a red flag," especially where employer investigated employee's allegations in the interim); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847 (8th Cir. 2005) (holding that four-week time gap following harassment complaint was too long to establish causal connection)).)

Mr. Grant's complaint to Great Arrow's Labor Relations office about the oral insults from his co-worker, "Mike" does not constitute a protected activity for the same reasons. As alleged by Mr. Grant, the incident involved a non-supervisor welder named "Mike" telling Mr. Grant, "you're not worth s***" and "you're a piece of s***. . . ." (Pl's Resp. ¶¶ 57–58.) While these statements are certainly callous, they do not appear to be discriminatory or a violation of either Title VII or the PHRA such that Mr. Grant's complaining about them would be statutorily protected activity. Mr. Grant does not allege that these statements from "Mike" were meant to be discriminatory or were motivated by racial animus, nor does he allege that he attributed them to racial discrimination

26

when he reported the incident to his foreman. (*See id.*)  Mr. Grant also does not allege when in time this incident occurred, let alone that it occurred so close to the termination of his employment as to be "unusually suggestive" of a causal link between the two. Since Mr. Grant has not carried his burden at least to "show" with record evidence that he engaged in a protected activity and that his complaints about "Mike" could be plausibly found to be the cause of the termination of his employment, the Court concludes that no reasonable jury could find for Mr. Grant on his retaliation claims.

In any event, by not responding to Great Arrow's Motion for Summary Judgment on this issue, Mr. Grant abandoned his retaliation claim. Defendant's Motion for Summary Judgment plainly states that it is seeking summary judgment as to Plaintiff's retaliation claims. (ECF No. 49 ¶ 4.) Mr. Grant's opposition filings do not include any direct reference or substantive discussion of his hostile environment claims. As with the hostile environment claim, this failure to respond substantively to Great Arrow's Motion for Summary Judgment on the retaliation claim amounts to an abandonment those claims, and the entry of summary judgment as to those claims is appropriate in light of the record advanced by the Defendant. *See, e.g.*, *McCarthy*, 2021 WL 5766569, at *2 n.3 ("Plaintiffs abandoned their claims under the LMRA . . . by omitting any reference to them in their opposition to Defendant's motion for summary judgment.); *Carroll*, 301 F. Supp. 3d at 511–12 (considering a claim abandoned when not addressed in brief in opposition to summary judgment).

V.      **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 49) is granted in full, and summary judgment is entered in Defendant's favor and against Plaintiff as to all claims. The Clerk will close the case on the docket.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  March 30, 2023